# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| CLAROS DIAGNOSTICS, INC. SHAREHOLDERS REPRESENTATIVE COMMITTEE, through its members MARC GOLDBERG, MICHAEL MAGLIOCHETTI, and ZACK SCOTT, | ) ) ) ) ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 2019-0262-SG |
| | ) | |
| OPKO HEALTH, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## <u>MEMORANDUM OPINION</u>

Date Submitted: November 12, 2019
Date Decided: February 19, 2020

Joanna J. Cline, Christopher B. Chuff, and Ellis E. Harrington, of PEPPER HAMILTON LLP, Wilmington, Delaware; OF COUNSEL: William W. Taylor and Jaclyn M. Essinger, of PEPPER HAMILTON LLP, Boston, Massachusetts, *Attorneys for Plaintiff Claros Diagnostics, Inc. Shareholders Representative Committee*.

David J. Teklits and Alexandra M. Cummings, of MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, Delaware; OF COUNSEL: Kenneth A. Sweder and Brian M. Haney, of SWEEDER & ROSS LLP, Boston, Massachusetts, *Attorneys for Defendant OPKO Health, Inc*.

GLASSCOCK, Vice Chancellor

A recurring scenario in this Court involves disputes between buyers and sellers of entities over earn-out provisions for post-acquisition performance. The incentives peculiar to such agreements, perhaps, make disputes, if not inevitable, common. This matter arises from sale of an entity that had developed medical-diagnostic technology. The Plaintiff—a committee representing sellers of that entity—seeks to enforce an earn-out provision of the merger agreement it says has been achieved. The Defendant buyer seeks to avoid liability, in part by pointing to what it characterizes as fraud in the inducement of the merger agreement and related breaches of representations and warranties. It seeks to do so via affirmative defenses and counterclaims raised in its answer.

The rub for the Defendant is that the merger took place in 2011 and the fraud and the rep-and-warranty violations were known to the Defendant no later than 2012—it acknowledges that its claims in this regard are stale and subject to laches. In other words, the Defendant could have brought its contractual and tort claims years ago; it decided instead to proceed under the contract, leading to the achievement of a milestone that triggers the first contemplated earn-out. Nonetheless, the Defendant seeks to present its stale fraud and contract claims as offsets under the doctrine of recoupment.

A statute of limitation is designed to protect a litigant from being forced to defend claims where a claimant has delayed to the point that the litigant is

disadvantaged in her defense due to the passage of time, and where the litigant has a right to thus expect repose from legal action. The statute of limitation represents a legislative conclusion as to when this point—three years, for contract rights—has passed; equity generally follows the law in this regard. Recoupment is an equitable doctrine based on twin interests: efficiency and fairness. When invoked to resuscitate otherwise stale claims it stands in opposition to the dogmatic application of a statute of limitations and laches, where the facts pertaining to a plaintiff's claims and defendant's affirmative defenses or counterclaims are so intertwined that the matter necessarily involves the development of a record which supports analysis of the affirmative defenses or counterclaims. In that limited subset of cases, the advantages of enforcing the statute of limitation are not present: the plaintiff herself has decided to enter the legal fray, and the difficulties of mounting a defense to a stale allegation are not present, since the facts necessary to the plaintiff's claim by definition are the same or closely related to those supporting the affirmative defense. Because equity does not blindly follow doctrines beyond the limits of their utility, in such cases a defendant may demonstrate a right to recoupment on an otherwise-stale claim.

Here, the Plaintiff moves to strike the affirmative defenses to the extent they seek offsets for claims barred by the statute of limitations. The Defendant seeks to proceed in recoupment. I find, however, that the affirmative defenses the Defendant

2

seeks to prove—arising from fraud and breach of contract in the formation of the merger agreement—are too attenuated from the contractual right on which the Plaintiff relies to support recoupment. The Plaintiff's claims rely on the recent achievement of milestones triggering earn-out payments. The background facts on which the Defendant seeks to demonstrate tort and contract damages are unrelated to the earn-out right and would require creating a record separate from the Plaintiff's claims, and therefore the rationale for allowing recoupment based on time-barred claims is absent. The Motion to Strike certain affirmative defenses is granted, therefore.

The Plaintiff also seeks to dismiss Defendant's counterclaims for declaratory relief, but I find those claims, at least in part, not subject to dismissal on statute-of-limitation grounds. Finally, the Plaintiff's motion to strike the unclean hands defense requires a further record.

My rationale follows.

## I. BACKGROUND[1]

### A. *The Parties and Relevant Non-parties*

Non-party Claros Diagnostics, Inc. ("Claros"), was a Massachusetts-based company founded in 2004 engaged in developing, manufacturing, and selling

---

[1] The facts, except where otherwise noted, are drawn from the well-pled allegations of the Defendant's Answer and Verified Counterclaims ("Answer" or "Answ.") and exhibits or documents incorporated by reference therein, which are presumed true for purposes of evaluating the Plaintiff's Motion to Dismiss.

medical diagnostic devices.[2] Claros focused on developing blood testing devices for use in physician offices for tests that otherwise were typically performed in a laboratory.[3] Claros was acquired by OPKO Health, Inc. ("OPKO") in 2011.[4]

Defendant and Counterclaim-Plaintiff OPKO is a Delaware corporation headquartered in Miami, Florida.[5] OPKO is a publicly-traded healthcare company focused on diagnostics and pharmaceuticals.[6]

Plaintiff and Counterclaim-Defendant Claros Diagnostics, Inc. Shareholder Representative Committee (the "Committee") is authorized to act on behalf of Marc Goldberg, Dr. Michael J. Magliochetti, and Dr. Zack Scott (the "Claros Shareholders") to "negotiate, undertake, compromise, defend resolve and settle any suit, proceeding or dispute" under the 2011 Agreement and Plan of Merger Between OPKO Health, Inc., Claros Merger Subsidiary, LLC, Claros Diagnostics, Inc., and Ellen Baron, Marc Goldberg, and Michael Magliochetti, acting in his/her capacity as members of the Shareholder Representative Committee (the "Merger Agreement").[7]

---

[2] Answ., at 6.
[3] *Id*.
[4] *Id*. at 1.
[5] *Id*. at 5.
[6] *Id*.
[7] *Id*. at 4; Verified Complaint, D.I. 1 ("Compl."), Ex 1. "Agreement and Plan of Merger" ("Merger Agreement"), § 3.12(b)(iv).

## B. Claros' Product and Merger Discussions

As of 2010, Claros had developed products which it publicized could diagnose "as many diseases as big laboratories [could]—but quickly, cheaply and in remote locations."[8] The products were said to be able to diagnose such diseases on the spot, using only a drop of blood on a disposable $1 plastic cassette card and a "book-size" analyzer.[9] Claros was led by its CEO Dr. Michael J. Magliochetti ("Magliochetti"), Co-Founder and Chief Operating Officer David Steinmiller ("Steinmiller"), and Co-Founder and Chief Technology Officer Vincent Linder ("Linder").[10]

In 2011, OPKO approached Claros and began discussions regarding a purchase of Claros—including all of Claros' intellectual property and products (the "Claros Technology") which, with other assets functioned together as a system (the "Claros System")—by OPKO or an OPKO-owned subsidiary.[11] As part of the due diligence process, Claros furnished to OPKO various documents (the "Due Diligence Documents") by uploading them into a data room on September 22, 2011 and thereafter.[12] The Due Diligence Documents contained information regarding (i) obtaining laboratory quality results, (ii) the accuracy and precision of the Claros System, (iii) the "launch ready" nature of the Claros System, (iv) the "on-cassette

---

[8] Answ., at 28.
[9] Id.
[10] Id. Magliochetti and Steinmiller were also directors of Claros. Id.
[11] Id. at 29.
[12] Id.

controls," (v) the stability of the Claros System, (vi) the cost of the goods for the disposable cassettes, (vii) a European launch, and (viii) statements regarding the multiplex capabilities of the Claros System.[13] OPKO's Answer and Verified Counterclaims (the "Answer") notes that of particular importance to the commercial value of the Claros System was its purported abilities concerning multiplexing for different tests from one drop of blood.[14]

Claros and OPKO contemplated a transaction where Magliochetti, Steinmiller, and Linder were to hold the same officer positions with the new OPKO-owned entity as they held with Claros.[15] Under this arrangement, OPKO projected before the acquisition that the Claros System would generate operating profits in excess of $250 million from 2012 through 2018.[16]

*C. The Merger Agreement*

On October 13, 2011, the parties entered into the Merger Agreement whereby Claros merged with Claros Merger Subsidiary, LLC, a Delaware limited liability company and a wholly-owned subsidiary of OPKO (the "Merger").[17] OPKO paid $10 million in cash,[18] and $22.5 million in shares of OPKO common stock in

---

[13] *Id*. at 30.
[14] *Id*. at 35.
[15] *Id*. at 30–31.
[16] *Id*. at 31, 36.
[17] *Id*. at 31.
[18] Subject to certain set-offs and deductions.

6

connection with the Merger.[19]  The Merger Agreement provided for possible further payments of OPKO common stock to the Claros Shareholders upon the achievement of certain milestones.[20]  Claros also made certain representations and warranties in the Merger Agreement.  The milestones and representations and warranties are particularly relevant to this Action.

### 1. Milestones

Section 2.9 of the Merger Agreement provides that OPKO "shall make milestone payments (the 'Milestone Payments') to the Shareholders and all other holders of [Claros stock] exchanged pursuant to the Merger in the amounts listed on Schedule 1 to [the Merger Agreement], in each case subject to, and within (20) days following [Claros'] achievement of, the milestones (the 'Milestones') set opposite each such amount on Schedule 1."[21]

Schedule 1 is replicated, in pertinent part, in Annex "A," attached at the end of this Memorandum Opinion.  Relevant at this stage, the first Milestone is:

> Receipt of approval or clearance by the FDA to market (i) Claros' rapid quantitative point-of-care diagnostic platform, or (ii) any substantially similar or derivative or replacement product which requires the practice of the Intellectual Property of the Company (the "Claros System") in the United States for prostate specific antigen testing[.][22]

---

[19] Answ., at 7.
[20] *Id*. at 31.
[21] Merger Agreement, § 2.9(a).  The Milestone Payments are payable "solely in shares of [OPKO] Common Stock . . . ."  *Id*.
[22] *Id*. at Schedule 1.

OPKO agreed to pay the Claros Shareholders $2.375 million in OPKO common stock upon the achievement of the first Milestone.[23]

OPKO also agreed that "until such time as all of the Milestones have been achieved, and all of the Milestone Payments have been made, (i) [OPKO] and [Claros] shall use commercially reasonable efforts, in good faith, to cause all of the Milestones to be achieved and (ii) [Claros] and [OPKO] shall not take any actions (or omit to take any actions) which are intended to frustrate or prevent, or could reasonably be expected to frustrate or prevent, the achievement of any of the Milestones."[24]

### 2. Representations and Warranties

The Merger Agreement also contains certain representations and warranties made by Claros to OPKO. Two representations and warranties are pertinent here.

In Section 6.17(h), Claros represents and warrants:

> Except as disclosed in Schedule 6.17(h), no Company Product[25]: (i) contains any bug, defect or error (including, without limitation, any bug, defect or error relating to or resulting from the display,

---

[23] *Id.*

[24] *Id.* § 2.9(b). The Section continues: " For purposes of the foregoing clause (i) in this Section 2.9(b), 'commercially reasonable efforts' shall mean the efforts and resources normally used by a party engaged in the medical device industry in connection with the development and commercialization in the European Union and the United States as is typically expended for a medical diagnostic device with a similar market potential and at a similar stage in its development or commercialization, taking into account the competitiveness of the marketplace, the party's proprietary position with respect to such product, applicable regulatory circumstances, the potential or actual profitability of such product, and all other relevant factors." *Id.*

[25] Defined as "products or services currently, or currently contemplated to be, marketed, sold, licensed or otherwise made available by [Claros] in its business as presently conducted . . . ." *Id.* § 6.17(a)(1).

manipulation, processing, storage, transmission or use of data) that materially and adversely affects the use, functionality or performance of such Company Product or any product or system containing or used in conjunction with such Company Product; or (ii) fails to comply with any applicable warranty or other contractual commitment relating to the use, functionality or performance of such Company Product.[26]

No bugs, defects or errors were listed on Schedule 6.17(h).[27]

In Section 6.17(l), Claros represents and warrants that "[t]he Company Products conform in all material respects to the functional specifications listed in Schedule 6.17(l).[28]

*D. Post-Merger Changes to the Claros Technology and FDA Approval*

After the Merger, Claros[29] continued to largely operate as a standalone entity in Massachusetts with the core original Claros employees remaining with the Company.[30] An employee (the "whistleblower") not part of this original group told OPKO of problems with the Claros System—the whistleblower was then "castigated" by Claros-legacy-officer Vincent Linder.[31] At some point after the Merger closed, OPKO realized that the Claros System was not ready for a "European market launch" as it had expected nor would it achieve the first Milestone by the

---

[26] *Id*. § 6.17(h).

[27] Answ., at 42. The Merger Agreement filed with the Complaint does not contain a Schedule 6.17(h).

[28] Merger Agreement, § 6.17(l). The Merger Agreement filed with the Complaint does not contain a Schedule 6.17(l).

[29] For simplicity's sake I continue to refer to the Claros entity post-Merger as "Claros" notwithstanding that it merged into a wholly-owned subsidiary of OPKO.

[30] Answ., at 32.

[31] *Id*.

third quarter of 2012 as anticipated.[32] After the whistleblower told OPKO of problems with the Claros System, Steinmiller and Linder subsequently acknowledged in a report to OPKO dated December 18, 2012 (the "First Report") that the Claros System had an error rate of 30.6% and an external control error rate of 36%.[33] These error rates were "attributable to design and manufacturing process problems and defects" in the Claros System.[34] The First Report noted the need for changes in the "external control, internal control, sample flow and lyo reconstruction, reagent flow and mixing, solid phase preparation, and stability" aspects of the Claros Technology.[35] The First Report also concluded that in order to obtain manufacturing consistency, changes were required in quality management for manufacturing, staff quality control in the laboratory, process/automation improvement, training and training effectiveness, and expanded production oversight.[36] Steinmiller and Linder delivered a second report dated February 9, 2013 (the "Second Report") which reported the same error rates and specified in more

---

[32] *Id*. at 33.

[33] *Id*. at 32; Opening Br. in Support of Pl.'s Mot. to Dismiss Def.'s Verified Countercls. and Strike Affirmative Defenses, D.I. 16, at 8 (noting date of the First Report). The external control refers to pre-testing of the system at the point of care. Answ., at 32.

[34] Answ., at 32.

[35] *Id*.

[36] *Id*. at 32–33.

detail the problems and possible solutions along with other defects and problems with the Claros Technology.[37]

In the OPKO corporate family tree Claros was within OPKO Diagnostics.[38] A new President of OPKO Diagnostics was appointed and his responsibilities included providing technical review and oversight of the redesigns and reinventions of the Claros Technology so that the Claros System could proceed with clinical trials in pursuit of regulatory approval for the Claros System.[39] OPKO made numerous changes to the Claros Technology including rework of the blood collection system and redesign of the blood collection device—these changes led to the issuance of new patents.[40] OPKO also made changes to the product design and manufacturing process with respect to controls of incoming material, in-process material, and final product performance assessment.[41] Stability studies revealed a defect in the design of the Claros cassette card and in the chemistry of the card which limited the longevity of the cards—an effort was undertaken to remedy these stability defects.[42] It was also found that the cost of goods for the Prostate Specific Antigen ("PSA") test cassette was a multiple of the amounts projected by Claros—the excess cost

---

[37] *Id.* at 33; *see* Opening Br. in Support of Pl.'s Mot. to Dismiss Def.'s Verified Countercls. and Strike Affirmative Defenses, D.I. 16, at 8 (noting date of the Second Report).
[38] Answ., at 34.
[39] *Id.*
[40] *Id.*
[41] *Id.*
[42] *Id.* at 34–35.

11

resulted from the advanced precision injection molding technology and assembly originally developed by Claros.[43]    A redesign and reinvention of the Claros Technology and Claros System for the single PSA test was completed at the end of 2016.[44]    The redesign and reinvention included changes to "virtually all" of the associated reagents, calibrators, controls, and solution of antibodies of the Claros Technology and the Claros System.[45]

Clinical studies took place in 2017.[46]  In 2018 the Pre-Market Authorization process with the Food and Drug Administration (the "FDA") was undertaken for the PSA test.[47]  On January 30, 2019 OPKO received FDA approval to market the Claros rapid point of care diagnostic platform in the United States for PSA testing.[48]  Such approval, per the Committee, is the trigger set out in Schedule I of the Merger Agreement for the first Milestone Payment.  In the press release announcing the FDA approval, OPKO stated that it "plans to expand the number of assays on the Claros 1 technology platform through future submissions to the FDA, including a planned

---

[43] *Id*. at 35.
[44] *Id*.  As noted above, the first Milestone is defined in the Merger Agreement as "[r]eceipt of approval or clearance by the FDA to market (i) Claros' rapid quantitative point-of-care diagnostic platform, or (ii) any substantially similar or derivative or replacement product which requires the practice of Intellectual Property of [Claros] . . . in the United States for [PSA] testing."  Merger Agreement, at Schedule 1.
[45] Answ., at 35.
[46] *Id*. at 36.
[47] *Id*.
[48] *Id*. at 12.

submission for a testosterone test later this year."[49]  In total, OPKO spent in excess of $95 million in research and development and other costs on the Claros Technology and Claros System from 2012 through 2018 and recognized no sales or profit in that time period.[50]  In February 2019, OPKO Executive Vice President–Administration and Director, Steven Rubin, told Dr. Magliochetti that OPKO would not make the first Milestone Payment and OPKO has not made such payment.[51]

*E. The Committee's Claims*

On April 5, 2019 the Committee filed its Verified Complaint (the "Complaint").  The Complaint pled claims for breach of contract, repudiation, and breach of the implied covenant of good faith and fair dealing against OPKO.[52]

The Committee's breach of contract claim alleged two breaches of the Merger Agreement by OPKO.[53]  The first alleged breach is of Section 2.9(a) and Schedule 1 of the Merger Agreement, whereby OPKO is obligated to make a corresponding Milestone Payment within 20 days of the completion of a Milestone.[54]  The Committee alleges that the FDA approval obtained on January 30, 2019 qualifies as the first Milestone and entitles the Claros Shareholders to $2.375 million in OPKO

---

[49] *Id.* at 15.
[50] *Id.* at 36.
[51] *Id.* at 14, 22.
[52] Compl.
[53] *Id.* ¶¶ 49–66.
[54] *Id.* ¶ 52; Merger Agreement, § 2.9(a), Schedule 1.

common stock.[55]  The Committee alleges that OPKO has failed to pay the first Milestone Payment—OPKO has not denied that it has not paid $2.375 million in OPKO common stock to the Claros Shareholders.[56]  The second breach of contract claim is for breach of Section 2.9(b) of the Merger Agreement, requiring OPKO to use "commercially reasonable efforts" to achieve the Milestones and not take any actions (or omit to take any actions) intended to frustrate or prevent, or that could reasonably be expected to frustrate or prevent, the achievement of any of the Milestones.[57]  The Committee alleges that OPKO plans to abandon the development and commercialization of the Claros Technology and the Claros System with the intent (or with reasonable expectation) to frustrate or prevent the achievement of the Milestones.[58]

The Committee's repudiation claim alleges that OPKO has stated its intent (i) not to perform under the Merger Agreement[59] and (ii) not to perform under the Merger Agreement except on terms different from the Merger Agreement.[60]  The

---

[55] Compl., ¶ 54.

[56] Id. ¶ 54; Answ., at 22.

[57] Compl., ¶ 55; Merger Agreement, § 2.9(b).

[58] Compl., ¶¶ 60–61.  The Committee also alleges that no commercially reasonable or good faith basis exists to abandon efforts to develop and commercialize the Claros Technology or the Claros System.  Id. ¶ 62.

[59] Allegedly Mr. Rubin represented to Dr. Magliochetti in February 2019 that "Opko will shelve the Claros Products for the specific reason of avoiding Milestone Payments."  Id. ¶ 71.

[60] Allegedly, in oral and written communications, OPKO "stated that it would not pay the Claros Shareholders any of the Milestone Payments unless the []Committee agreed to an accelerated, discounted earn-out and threatened to litigate and argue the Claros Shareholders are not entitled to any payments."  Id. ¶ 72.

Committee's implied covenant claim alleges that OPKO's actions breached the implied covenant of good faith and fair dealing by "exert[ing] economic coercion on the Claros Shareholders to force them to settle for an amount far lower than they would be entitled to receive under the [Merger] Agreement."[61]

### F. OPKO's Affirmative Defenses and Counterclaims

OPKO filed its Answer and Verified Counterclaims on May 14, 2019. OPKO pled four affirmative defenses. Its counterclaims request declaratory relief, and fees and expenses.

OPKO's first affirmative defense is fraudulent inducement.[62] OPKO claims that it relied upon allegedly false representations made by Claros in the Due Diligence Documents and that Dr. Magliochetti, Steinmiller, and Linder knew of the falsity of the representations.[63] OPKO alleges that the misrepresentations were made with the specific intent of inducing OPKO to enter into the Merger Agreement, that OPKO acted in justifiable reliance on such representations, and that OPKO has suffered substantial harm in relying upon such representations.[64]

OPKO's second affirmative defense is unclean hands, alleging that Claros' alleged fraudulent inducement and alleged failure to disclose the purported "bugs,

---

[61] *Id.* ¶ 77.

[62] Answ., at 28.

[63] *Id.* at 30. In the alternative (of the falsity of representations) OPKO claims that representations were rendered false by omissions which Claros had a duty to disclose. *Id.*

[64] *Id.*

defects, and errors" of the Claros Technology and the Claros System constitutes unclean hands and bars the Claros Shareholders from receiving the relief sought in the Complaint.[65]

OPKO's third affirmative defense alleges that Claros breached the representations and warranties in Sections 6.17(h)(i) and 6.17(l)[66] of the Merger Agreement.[67]  OPKO contends that the projected $250 million in operating profit (from 2012–2018) and the expenditures in excess of $95 million in research and development costs should be offset against any award made to the Committee in this Action.[68]  OPKO further states that Claros' alleged breaches of the Merger Agreement should excuse OPKO from any further performance under the Merger Agreement, "including but not limited to any payment for any Milestones which have been achieved or may be achieved in the future and any obligation to take further action or expend further amounts to achieve any Milestones."[69]

OPKO's fourth affirmative defense states that the Claros Shareholders' claims for equitable relief are barred because they have an adequate remedy at law.[70]

OPKO's counterclaims for declaratory relief plead that because of the alleged fraudulent inducement and breaches of contract, and because of OPKO's

---

[65] *Id*. at 37.
[66] *See* Section I.C.2. *supra*.
[67] Answ., at 42.
[68] *Id*. at 43.
[69] *Id*.
[70] *Id*. at 44.

expenditures in developing the Claros Technology and Claros System to date OPKO should be excused from taking further actions under the Merger Agreement to achieve additional Milestones.[71] OPKO contends that the efforts and expenditures already made by it "far exceed the commercially reasonable efforts required of OPKO under the [Merger] Agreement."[72] OPKO asks for a declaratory relief: (A) declaring that the Claros Shareholders are not entitled to payment of the first Milestone Payment under the Merger Agreement; (B) declaring that the Claros Shareholders are not entitled to payment of any further Milestone Payments if further Milestones are achieved under the Merger Agreement; (C) declaring that OPKO has no further obligation under the Merger Agreement to cause any or all of the Milestones to be achieved; (D) awarding OPKO all reasonable fees and expenses of counsel in this Action; and (E) granting such other and further relief as the Court may deem just and proper.[73]

### G. Procedural Posture

The Committee moved to dismiss OPKO's counterclaims and strike OPKO's first, second, and third affirmative defenses on June 4, 2019. I heard Oral Argument on the Committee's Motion on October 14, 2019 at which point the parties asked to submit supplemental memoranda, which I permitted. The final supplemental

---

[71] *Id.* at 47.
[72] *Id.* at 47–48.
[73] *Id.* at 48.

memorandum was submitted on November 12, 2019 and I considered the matter submitted for decision on that date.

## II. ANALYSIS

The Committee has moved to dismiss the fraud-based counterclaim and defense under Chancery Court Rule 9(b)[74] and all counterclaims under Chancery Court Rule 12(b)(6).[75] The standard for dismissal under Rule 12(b)(6) is well settled:

> (i) all well-pleaded factual allegations are accepted as true; (ii) even vague allegations are well-pleaded if they give the opposing party notice of the claim; (iii) the Court must draw all reasonable inferences in favor of the non-moving party; and (iv) dismissal is inappropriate unless the plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances susceptible of proof.[76]

I need not, however, "accept conclusory allegations unsupported by specific facts or . . . draw unreasonable inferences in favor of the non-moving party."[77] Because OPKO is the non-moving party here, the Answer is the operative pleading stage

---

[74] Ch. Ct. R. 9(b). OPKO asserts that declaratory judgments should be grated on account of (1) fraudulent inducement, (2) breach of contract, and (3) OPKO's use of "commercially reasonable efforts." The parties have thus briefed the counterclaim by reference to the nature of the underlying claim—an approach which is consistent with Delaware law. *See Kraft v. WisdomTree Invs., Inc.*, 145 A.3d 969, 985 (Del. Ch. 2016) (Recognizing that certain cases in this Court "have linked the nature of the declaratory judgment to the nature of the underlying claim."). I thus consider declaratory judgment claims by reference to the underlying claim.

[75] Ch. Ct. R. 12(b)(6).

[76] *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896–97 (Del. 2002) (footnotes and internal quotation marks omitted).

[77] *Price v. E.I. DuPont de Nemours & Co.*, 26 A.3d 162, 166 (Del. 2011).

18

document—I also refer to the Merger Agreement, which is incorporated by reference therein.

The Committee has also moved to strike OPKO's first (fraudulent inducement), second (unclean hands), and third (breach of contract) affirmative defenses under Chancery Court Rule 12(f).[78] On a motion to strike, "the inquiry is usually whether, assuming the truth of the facts alleged in the answer, the challenged defense is legally sufficient."[79]

*A. The Motion to Dismiss and Strike*

The Committee has moved to dismiss or strike all of OPKO's counterclaims and three of its four affirmative defenses on the ground that they are untimely. OPKO filed its responsive pleading[80] on May 14, 2019.

The Committee contends that OPKO's fraud-based counterclaim and affirmative defense is barred by laches because fraudulent inducement claims are subject to a three-year statute of limitations, a period which begins "at the moment of the wrongful act."[81] Because this is a court of equity, a statute of limitations does not automatically bar an action because actions in equity are time-barred only by the

---

[78] Ch. Ct. R. 12(f).
[79] *Holtzman v. Gruen Holding Corp.*, 1994 WL 444756, at *3 (Del. Ch. Aug. 5, 1994).
[80] i.e. the Answer.
[81] *Fike v. Ruger*, 754 A.2d 254, 260 (Del. Ch. 1999), *aff'd*, 752 A.2d 112 (Del. 2000) (citing *In re Dean Witter P'ship Litig.*, 1998 WL 442456, at *4 (Del. Ch. July 17, 1998)); 10 *Del. C.* § 8106.

equitable doctrine of laches, invoked by the Committee.[82]   However, where a party seeks equitable relief this Court applies the statute of limitations by analogy and thus, absent tolling of the limitations period, a party's failure to file within the analogous limitations period is given great weight in deciding whether a claim is barred by laches.[83]   The Committee contends that even if the fraud-based counterclaim and affirmative defense could be tolled, that tolling would extend the beginning of the limitations period no later than December 18, 2012, the date of the First Report, because at that point OPKO had actual knowledge of the veracity of the Due Diligence Documents.  Thus in the Committee's reading, the analogous limitations period for the fraud-based counterclaim and affirmative defense would have run, at the latest, on December 18, 2015.

The Committee also contends that the breach of contract counterclaim and affirmative defense is untimely because it is not within the survival period provided for in the Merger Agreement.  The Merger Agreement explicitly limits the survival period of representations and warranties to two years after the closing date of the Merger.[84]   The Merger closed on October 13, 2011.[85]   Thus, under this view any

---

[82] *Whittington v. Dragon Grp., L.L.C.*, 991 A.2d 1, 9 (Del. 2009) (quoting *Albert v. Alex. Brown Mgmt. Servs.*, 2005 WL 1594085, at *12 (Del. Ch. June 29, 2005)).

[83] *Id*. (citing *Weiss v. Swanson*, 948 A.2d 433, 451 (Del. Ch. 2008); *Adams v. Jankouskas*, 452 A.2d 148, 157 (Del. 1982)).

[84] Merger Agreement, § 7.2.

[85] Answ., at 7.

claim for breach of the representations and warranties in the Merger Agreement would be time-barred unless it was filed by October 13, 2013.

Finally, the Committee submits that because OPKO's unclean hands affirmative defense is "based on the same allegations as [OPKO's] Counterclaims" and those counterclaims are untimely, the unclean hands defense is likewise untimely.[86]

*B. Recoupment*

OPKO has not contested that its fraud-based and breach of contract claims and defenses[87] are time-barred to obtain affirmative (offensive) relief, but urges they are properly asserted as affirmative defenses and defensive counterclaims under the doctrine of recoupment. "Recoupment is a common-law, equitable doctrine that permits a defendant to assert a defensive claim aimed at reducing the amount of damages recoverable by a plaintiff."[88] Recoupment may be raised under certain circumstances as a "narrow exception" to the limitations period that permits a

---

[86] Opening Br. in Support of Pl.'s Mot. to Dismiss Def.'s Verified Countercls. and Strike Affirmative Defenses, D.I. 16, at 22.

[87] Because these affirmative defenses, so called, are in fact attempts to raise affirmative claims for damages for purposes of reducing the Committee's alleged damages, they are subject to contractual and statutory time limitations. *See* 80 C.J.S. Set-off and Counterclaim § 2 (2020) ("Recoupment is . . . in the nature of a defense, as it denies the validity of plaintiff's claim in the amount claimed, and does not entitle a defendant to any affirmative relief or any amount in excess of the amount demanded by plaintiff. While technically no affirmative relief may be had on recoupment, it is an affirmative cause of action that is distinct from a defense that merely attempts to defeat the plaintiff's cause of action by denial or avoidance.") (internal citations omitted).

[88] *TIFD III-X LLC v. Fruehauf Prod. Co.*, 883 A.2d 854, 859 (Del. Ch. 2004) (quoting 80 C.J.S. Set-off and Counterclaim § 2 (2000)).

defendant to "resuscitate a time-barred claim and reduce the amount of damages that a plaintiff recovers."[89] A recoupment claim must involve the same litigants as the damages claim and the defendant must show that "(i) the claims arose out of the same transaction or occurrence [that is, that they have a close "transactional nexus"], (ii) it is sought defensively rather than as the basis for affirmative recovery, and (iii) the nature of the relief sought is similar to the plaintiff's."[90] A successful recoupment claim is limited to the extent of the plaintiff's recovery.[91]

Our Supreme Court has cautioned that this Court must use "great care" before permitting a party to employ recoupment to assert a stale claim to reduce its liability for timely claims.[92] In this vein, in *TIFD III–X LLC v. Fruehauf Production Co., L.L.C.*[93] then-Vice Chancellor Strine remarked:

> [W]here the plaintiff's claim and the defendant's 'defense' are factually unrelated, the defendant should not be permitted to assert that defense under the rubric of recoupment. To hold otherwise would permit defendants to avoid statutes of limitation by creative pleading without serving the efficiency concerns underlying the doctrine, and would turn a narrow equitable doctrine designed to permit a summing up of liabilities in a tightly connected factual dispute into a wide-ranging license to revive a relationship's worth of stale grievances, which long predate the fresh dispute that brings the parties to court. To sanction

---

[89] *Terramar Retail Centers, LLC v. Marion #2-Seaport Tr.*, 2019 WL 2208465, at *20 (Del. Ch. May 22, 2019), *aff'd sub nom. Marion #2-Seaport Tr. U/A/D June 21, 2002 v. Terramar Retail Centers, LLC*, 2019 WL 5681450 (Del. Nov. 1, 2019) (citing *TIFD*, 883 A.2d at 860).

[90] *Universal Enter. Grp., L.P. v Duncan Petroleum Corp.,* 2013 WL 4833706, at *2 (Del. Ch. Sep. 10, 2013) *aff'd* 99 A.3d 228 (Del. 2014) (citing *TIFD*, 883 A.2d at 859).

[91] *Id.* (citing 80 C.J.S. Set-off and Counterclaim § 2 (2013)).

[92] *Finger Lakes Capital Partners, LLC v. Honeoye Lake Acquisition, LLC*, 151 A.3d 450, 454 (Del. 2016).

[93] 883 A.2d 854 (Del. Ch. 2004).

such inefficiency and inequity in the name of recoupment is inadvisable.[94]

Accordingly, Delaware law looks at recoupment's "transactional nexus" prong with a jaundiced eye, requiring it be "tightly constrained."[95]

A number of this Court's cases exemplify the straightened nature of recoupment's "transactional nexus" requirement. In *TIFD*, the plaintiff requested a declaration interpreting a distribution provision of a dissolved partnership's constitutional document and the defendant asserted recoupment claims based on alleged breaches of that agreement over the life of the partnership.[96] This Court did not permit the defendant to raise the recoupment claims, because the transaction at issue, the dissolving of the partnership, was "unrelated" to the plaintiff's alleged past breaches of the partnership agreement.[97] *TIFD* remarked that "the fact that a single contract is involved does not suffice to demonstrate that the necessary transactional nexus exists."[98]

In *United BioSource LLC v. Bracket Holding Corp.*[99] the plaintiff ("UBC") sold certain subsidiaries to the defendant ("Brackett") under a stock purchase agreement (the "SPA").[100] The SPA required Brackett to pay UBC certain tax

---

[94] *Id*. at 865.
[95] *Finger Lakes*, 151 A.3d at 450.
[96] *TIFD*, 883 A.2d at 855–867.
[97] *Id*.
[98] *Id*. at 864.
[99] 2017 WL 2256618 (Del. Ch. May 23, 2017).
[100] *Id.* at *1.

refunds after the closing of the transaction if the refunds met certain conditions.[101] After closing Brackett received a qualifying tax refund of nearly $5 million but refused deliver the tax refund to UBC during the pendency of a separate litigation in the Delaware Superior Court wherein Brackett (there the plaintiff) alleged that UBC (there the defendant) inflated financial statements and caused Brackett to overpay for the subsidiaries by over $80 million.[102]  UBC moved for summary judgment in this Court based on the contractual language requiring the tax refund be paid to it by Brackett.  Brackett did not dispute its breach, but raised a recoupment defense that UBC was not entitled to specific performance because of the alleged fraud which was the basis for the Superior Court action.  This Court found that facts underlying the Superior Court action did not "arise out of the same transaction or occurrence" as the pre-closing tax refund dispute because the financial statements "ha[d] no bearing on UBC's entitlement to the [t]ax [r]efund," and noted that UBC would have been entitled to the tax refund regardless of whether the parties entered into the SPA.[103]  Because the claims were transactionally unrelated, Brackett could not reduce (or eliminate) the amount owed to UBC pursuant to the tax refund by asserting the fraud claims as a recoupment defense.

---

[101] *Id*. at *2.
[102] *Id*. at *2, 6.
[103] *Id*. at *6.

In *Terramar Retail Centers, LLC v. Marion #2-Seaport Trust*,[104] one member ("Terramar") of a three-member limited liability company exercised a contractual right to dissolve the company and the other members disputed whether Terramar had validly exercised such right—Terramar filed an action where it sought a declaration (i) that it could dissolve the company and unilaterally sell its assets to a third party and (ii) that it had correctly determined the allocation of the sale proceeds.[105] The defendant (the "Trust") contended that this Court should adjust Terramar's distribution from the company downward because of Terramar's alleged breaches of contractual and fiduciary duties while operating and financing the company over a decade-plus long period.[106] This Court found that the Trust's stale challenges to Terramar's historical conduct involving alleged breaches of other provisions of the LLC agreement could not survive as recoupment defenses because they did not arise out the same transaction as the claims that Terramar had asserted under a specific section of the LLC agreement relating to its exercise of its put and dissolution rights.[107]

While the application of the recoupment doctrine's transactional nexus requirement is necessarily fact-specific, insights as to its contours can be gleaned

---

[104] 2019 WL 2208465 (Del. Ch. May 22, 2019), *aff'd sub nom. Marion #2-Seaport Tr. U/A/D June 21, 2002 v. Terramar Retail Centers, LLC*, 2019 WL 5681450 (Del. Nov. 1, 2019).
[105] *Id*. at *1.
[106] *Id*. at *19.
[107] *Id*. at *21.

from *TIFD*, *United BioSource*, and *Terramar*. First, the fact that a defense arises from the same relationship as does a plaintiff's claim is insufficient to permit the defense under a recoupment theory.[108] Likewise, the "transaction" for the transactional nexus inquiry focuses on the plaintiff's claim—and only the plaintiff's claim. Thus, an alleged breach of one potion of a contract is not transactionally related to a defense for recoupment purposes simply because the defense alleges a breach of the same contract.[109] Instead, the inquiry must be confined to the "factual core" of the plaintiff's claim, and recoupment is permitted only where the defense shares a "common factual core."[110]

The nexus requirement, thus viewed, is central to the application of recoupment, particularly where, as here, the limitations period would bar the claim if brought for affirmative relief. A stale claim is barred to prevent a defendant from the necessity to defend based on facts whose proof is made difficult by the passage of time, which itself is an artifact of the plaintiff's feckless inactivity. Laches allows parties who, because of the passage of time, should expect that the period for litigation has passed, to in fact enjoy such repose. Where, however, a plaintiff brings a claim that is factually interwoven with an offsetting but stale claim, the rationale

---

[108] *United BioSource*, 2017 WL 2256618, at *6.

[109] *Terramar*, 2019 WL 2208465, at *21 ("Where the contract itself contemplates the business to be transacted as discrete and independent units, even claims predicated on a single contract will be ineligible for recoupment." (quoting 80 C.J.S. Set-off and Counterclaim § 36 (2019))).

[110] *TIFD III-X LLC v. Fruehauf Prod. Co.*, 883 A.2d 854, 864 (Del. Ch. 2004).

for repose is not present. Such a plaintiff herself has initiated the action, and her claim will require development of much of what is necessary to the defendant's claim in recoupment. In such a case, equity is advanced by "permitting a court to examine all aspects of the transaction that is the subject of the action."[111] Recoupment is thus an efficiency doctrine and not a "wide-ranging license to revive a relationship's worth of stale grievances."[112]

Under this rubric, OPKO's affirmative defenses[113] of fraudulent inducement and breach of contract cannot serve as recoupment defenses because they do not arise out of the same transaction or occurrence as the Committee's claim for the first Milestone Payment under Section 2.9(a) and Schedule 1 of the Merger Agreement. OPKO's fraud-based and breach of contract defenses invoke historical conduct by Claros' principals and representations made in the Merger Agreement, and OPKO does not dispute that the criterion for the first Milestone[114] have been met.[115] Whether Claros' principals engaged in fraud or made misrepresentations has no

---

[111] *Id.*; 80 C.J.S. Set-off and Counterclaim § 2 (2020).

[112] *TIFD*, 883 A.2d at 865. I note that even Festivus requires that such airing of grievances take place on a *yearly* basis. *See Seinfeld: The Strike* (NBC television broadcast Dec. 18, 1997).

[113] I address OPKO's fraud-based and breach of contract counterclaims in Section II.D. *infra*.

[114] "Receipt of approval or clearance by the FDA to market (i) Claros' rapid quantitative point-of-care diagnostic platform, or (ii) any substantially similar or derivative or replacement product which requires the practice of the Intellectual Property of the Company . . . in the United States for prostate specific antigen testing." Merger Agreement, at Schedule 1.

[115] Answ., at 12 ("OPKO admits that on February 1, 2019 it received FDA approval to market the Claros rapid quantitative point-of-care diagnostic platform in the United States for prostate specific antigen testing . . . .").

effect on—nor does it share a factual core with—the Committee's contractual claim to receive Milestone Payments upon the achievement of Milestones. Nor do the fraud-based and contractual affirmative defenses share a factual core with the Committee's repudiation and implied covenant claims—those claims concern ongoing (or recent) conduct by OPKO and likewise have an insufficient transactional nexus with the historical conduct underlying the fraud-based and contractual defenses. That all claims arise out of the Merger Agreement does not change this analysis.[116]

OPKO analogizes to the transactional nexus this Court found sufficient in *Delaware Chemicals, Inc. v. Reichhold Chemicals, Inc.*[117] to the case at hand, but that case is readily distinguishable.[118] *Delaware Chemicals* concerned an agreement whereby the plaintiff transferred to the defendant certain information related to the production of an industrial chemical.[119] The plaintiff alleged that the defendant had

---

[116] *See TIFD*, 883 A.2d at 864; *Terramar Retail Centers, LLC v. Marion #2-Seaport Tr.*, 2019 WL 2208465, at *21 (Del. Ch. May 22, 2019), *aff'd sub nom. Marion #2-Seaport Tr. U/A/D June 21, 2002 v. Terramar Retail Centers, LLC*, 2019 WL 5681450 (Del. Nov. 1, 2019).

[117] 121 A.2d 913 (Del. Ch. 1956).

[118] OPKO also relies on *Winklevoss Capital Fund, LLC v. Shaw*, 2019 WL 994534 (Del. Ch. Mar. 1, 2019), a case in which this Court permitted stale claims to proceed on recoupment. The plaintiffs there alleged breach of contract and fiduciary duties in the conduct of a business venture; the defendants counterclaimed that the plaintiffs had themselves violated duties in the conduct of the same venture. The *Winklevoss* court noted that it could "discern no basis to restrict [the defendants] from presenting evidence of the [plaintiffs'] failure to honor agreements [in way of the business] as grounds to defend against [plaintiffs'] claim that [defendants] have not delivered all that was promised." *Id.* at *9. That analysis, I find, is not applicable to the instant facts. Here, OPKO seeks to recoup against damages arising from breach of a contract based on alleged wrongdoing from *formation* of that contract.

[119] *Delaware Chems.*, 121 A.2d at 914.

28

violated the agreement and was manufacturing the chemical by a "process derived from the engineering and chemical information, formulation, know-how, data and other secret knowledge supplied by the plaintiff."[120] The defendant disputed the plaintiff's allegations as to "the valuable character of the subject matter transferred to it under the contract" and asserted counterclaims and affirmative defenses.[121] This Court dismissed the counterclaims, which it found "clearly [sought] affirmative relief" but permitted the defendant to amend its counterclaims "so as to assert the counterclaims defensively" under the doctrine of recoupment.[122] But the transactional nexus in *Delaware Chemicals* is inapposite to the case at hand because there the dispute centered on the character of the information the plaintiff furnished to the defendant. The plaintiff claimed the defendant was using the plaintiff's information to engage in business outside of the bounds of the agreement whereas the defendant disputed the nature of the information transferred to it—to resolve both the affirmative claims and the permitted defensive counterclaims the Court would be required to delve into the particulars of what was passed from the plaintiff to the defendant and its connection to the defendants then-current business. Conversely, here, the underlying facts required to resolve the Committees' claims

---

[120] *Id*. at 916.
[121] *Id*.
[122] *Id*. at 918; *Finger Lakes Capital Partners, LLC v. Honeoye Lake Acquisition, LLC*, 151 A.3d 450, 453 n.6 (Del. 2016) (noting that *Delaware Chemicals* "involves recoupment and not setoff.").

share an insufficient overlapping nexus with OPKO's fraud-based and contractual affirmative defenses to support recoupment.

While my finding of a lack of a transactional nexus between the Committee's claims and OPKO's fraud-based and contractual affirmative defenses could stand on an analysis of the transactional nexus requirement alone, it also aligns with the policy rationale outlined in *TIFD*. In the context of historical counterclaims of breach of a partnership agreement being brought as recoupment claims upon the partnership's dissolution, then-Vice Chancellor Stine noted:

> Put simply, it makes little sense as a matter of policy to interpret the transactional nexus requirement so broadly as to permit a party to sit on its contractual rights and wait until dissolution to assert its claims. By that time, much of the evidence pertinent to those claims, such as testimony of employees involved in the relevant events who have long-since left the enterprise, might be unavailable or less reliable, and the plaintiff might be unable to mount a successful defense. Moreover, when a significant amount of time passes after a dispute arises and no claim is ever filed against a party, that party tends to assume that the dispute has been laid to rest. If parties entering into long-term relationships with one another can never be assured that they can move along in their relationship without remaining exposed to potential liability for events in the distant past, not only will the repose considerations embodied in statutes of limitations and the doctrine of laches be subverted, but the risk created by this uncertainty will make businesspersons less willing to commit capital to profit-generating enterprises such as partnerships for fear that every action or inaction they take during the life of the partnership might come back to haunt them at the relationship's end.[123]

---

[123] *TIFD III-X LLC v. Fruehauf Prod. Co.*, 883 A.2d 854, 865 (Del. Ch. 2004).

The Vice Chancellor's words apply with fresh vigor here. The Answer makes clear that OPKO knew of the alleged fraud and misrepresentations at or around completion of the First Report and the Second Report.[124] Those reports were completed in December 2012 and February 2013 respectively. OPKO could have pursued those claims in a timely fashion. Instead, presumably for business reasons of its own, OPKO chose to ignore what it claims were misrepresentations, and proceed to develop the Claros Technology and Claros System. OPKO was successful, triggering a Milestone Payment, according to the Committee. Only now, many years after discovery of the alleged misrepresentations, does OPKO attempt to force the Committee to defend these stale claims as an offset to OPKO's Milestone obligations. Such an application of the doctrine of recoupment would be repugnant to equity. Therefore, the Committee's Motion to Strike OPKO's first and third affirmative defenses is granted.

### C. Unclean Hands Affirmative Defense

The Committee urges that I strike OPKO's second affirmative defense of unclean hands as barred under the same rationale as the first and third affirmative defenses. Unclean hands refers to the equitable maxim that "he who comes into equity must do so with clean hands," and the doctrine exists to shield a court of

---

[124] Answ., at 32–33.

31

equity from a tarring with the misdeeds of the litigants before it.[125] Courts of equity, such as this Court, "have extraordinarily broad discretion in application of the doctrine of unclean hands."[126] However, this Court does not deny relief to a plaintiff under an unclean hands defense "simply because the plaintiff may have engaged in inequitable conduct in the past. Rather, the plaintiff's inequitable conduct must have an 'immediate and necessary' relation, to the claims for which the plaintiff seeks relief."[127] That is because the doctrine is not directed to whether a plaintiff is "worthy" in some sense of relief; it is not a tool which is aimed at benefiting a defendant or punishing a plaintiff, at all.[128] Instead, unclean hands is applied to protect the Court and its ability to do equity.[129] Where a litigant comes before this Court and seeks its assistance by invoking the power of equity, and that plaintiff has himself acted inequitably with respect to the *res* under consideration, the Court must decline. Otherwise, the Court itself becomes an agent of inequity. It is to prevent

---

[125] *Nakahara v. NS 1991 Am. Tr.*, 718 A.2d 518, 522 (Del. Ch. 1998) (quoting *Kousi v. Sugahara*, 1991 WL 248408, at *2 (Del. Ch. Nov. 21, 1991)).

[126] *Id.*

[127] *Kousi*, 1991 WL 248408, at *2.

[128] *Skoglund v. Ormand Indus., Inc.*, 372 A.2d 204, 213 (Del. Ch. 1976) ("[T]he clean hands maxim . . . is not a matter of defense to be applied on behalf of a litigant; rather it is a rule of public policy.").

[129] *In re Wilbert L.*, 2010 WL 3565489, at *5 (Del. Ch. Sept. 1, 2010) ("The unclean hands doctrine is deployed principally to protect courts of equity from misuse by those who have acted unconscionably. It need not apply only in a defensive posture, but may be used to save the Court from using its powers to benefit an undeserving party.") (internal citations omitted).

its own implication in a litigant's turpitude that this Court employs the doctrine of unclean hands.[130]

The doctrine, therefore, only applies where there exists a close nexus between the wrongdoing of the plaintiff and the relief he seeks.[131] The Court in considering unclean hands employs a relational requirement akin to the transactional nexus requirement of recoupment discussed above. Of this relational requirement, the United States Supreme Court noted in *Keystone Driller Co. v. General Excavator Co.*:

> [C]ourts of equity do not make the quality of suitors the test. They apply the maxim requiring clean hands only where some unconscionable act of one coming for relief has immediate and necessary relation to the equity that he seeks in respect of the matter in litigation. They do not close their doors because of plaintiff's misconduct, whatever its character, that has no relation to anything involved in the suit, but only for such violations of conscience as in

---

[130] *Nakahara*, 718 A.2d at 522 ("The unclean hands doctrine is aimed at providing courts of equity with a shield from the potentially entangling misdeeds of the litigants in any given case. The Court invokes the doctrine when faced with a litigant whose acts threaten to tarnish the Court's good name. In effect, the Court refuses to consider requests for equitable relief in circumstances where the litigant's own acts offend the very sense of equity to which he appeals."); *Gallagher v. Holcomb & Salter*, 1991 WL 158969, at *4 (Del. Ch. Aug. 16, 1991), *aff'd sub nom. New Castle Ins., Ltd. v. Gallagher*, 692 A.2d 414 (Del. 1997) ("The equitable doctrine of unclean hands is not strictly a defense to which a litigant is legally entitled. Rather, it is a rule of public policy to protect the public and the court against misuse by persons who, because of their conduct, have forfeited the right to have their claims considered. The question raised by a plea of unclean hands is whether the plaintiff's conduct is so offensive to the integrity of the court that his claims should be denied, regardless of their merit.") (internal citation omitted).
[131] *In re Farm Indus., Inc.*, 196 A.2d 582, 590 (Del. Ch. 1963) ("It is settled law in Delaware that relief may be barred by the doctrine of unclean hands only by reason of some conduct relating directly to the matter in controversy.").

some measure affect the equitable relations between the parties in respect of something brought before the court for adjudication.[132]

Typically, therefore, application of unclean hands is based upon a developed factual record.[133] Here, the allegation is that the contractual obligations the Committee seeks to enforce arose via fraud. The matter is at the pleading stage, and the parties have not, in my view, adequately addressed the nexus between the alleged fraud and the Milestone obligation. The burden on a motion to strike rests with the moving party, and I must decline to dismiss the unclean hands defense on this record.

### D. Motion to Dismiss OPKO's Counterclaims

The Committee has moved to dismiss OPKO's counterclaims on the same time-bar theory as its fraud-based and contractual affirmative defenses. However, OPKO's counterclaims invoke not only the alleged fraud and breaches of contract—the same allegations that animate its affirmative defenses—but also OPKO's expenditures in developing the Claros Technology and the Claros System. This pleading concerns the parties' dispute as to whether OPKO has used "commercially reasonable efforts" in compliance with Section 2.9(b) of the Merger Agreement—the Committee alleges OPKO has not done so and has repudiated its obligations under Section 2.9(b). OPKO cites its efforts in developing the Claros Technology

---

[132] *E. States Petroleum Co. v. Universal Oil Prod. Co.*, 8 A.2d 80, 82 (Del. 1939) (quoting *Keystone Driller Co. v. Gen. Excavator Co.*, 290 U.S. 240, 245 (1933)).

[133] *See Stone & Paper Inv'rs, LLC v. Blanch*, 2019 WL 2374005, at *9 (Del. Ch. May 31, 2019) ("Dismissing a complaint for unclean hands at the pleading stage is only appropriate in extreme circumstances.").

and the Claros System in asking this Court for affirmative relief in the form of a declaratory judgment that it need not pay the first Milestone Payment, or any further Milestone Payments, and that it has no further obligation to cause any or all of the Milestones to be achieved.[134] While the affirmative defenses I have dismissed relate solely to fraud and breach claims accruing as of the Merger date, OPKO's commercial efforts, based on the pleadings, are at least partially recent or ongoing. Because the pleadings supporting a counterclaim for affirmative relief invoke OPKO's efforts to develop the Claros Technology and the Claros System, and because those pleadings are inextricably intertwined with the fraud-based and contractual pleadings in support of such affirmative relief, I cannot dismiss OPKO's counterclaims as time-barred on this record. Therefore, the Committee's Motion to Dismiss OPKO's counterclaims is denied.

### III. CONCLUSION

The Committee's Motion to Strike is granted in part and denied in part. The Committee's Motion to Dismiss is denied. The parties should submit a form of order consistent with this Memorandum Opinion.

---

[134] OPKO also requests fees and expenses of counsel and any other relief that the Court "may deem just and proper." Answ., at 48.

| Milestone | Payment Amount |
|---|---|
| Receipt of approval or clearance by the FDA to market (i) Claros' rapid quantitative point-of-care diagnostic platform, or (ii) any substantially similar or derivative or replacement product which requires the practice of the Intellectual Property of the Company (the "Claros System") in the United States for prostate specific antigen testing .............. | $2.375 million |
| Receipt of CE Mark approval to market the Claros System throughout the European Union for testosterone testing ………………………………. | $1.875 million |
| Receipt of approval or clearance by the FDA to market the Claros System in the United States for testosterone testing ……………….......................... | $1.875 million |
| Development of the Claros System using one or more assays initially selected by the Buyer and | |
| (a) if one assay is selected for initial development by the Buyer, receipt of FDA approval or clearance receipt of CE Mark Approval; ………………....................................................... | (a) $3.75 million for FDA approval or clearance and 4.25 million for CE Mark approval |
| And | |
| (b) if two or more assays are selected for initial development by the Buyer, receipt of CE Mark approval for each of the first two assays ……........... | (b) $4.25 million for first CE Mark approval and $3.75 million for second CE Mark approval |
| Receipt of World-wide Net Revenues, attributable to Sales of Milestone Products, in excess of $50 million during any four consecutive fiscal quarters within four years following the first FDA approval to market any assay using any Milestone Product in the United States ……………………………… | $5.0 million[135] |

---

[135] Merger Agreement, at Schedule 1. Schedule 1 contains definitions or certain terms and references terms defined elsewhere in the Merger Agreement—such information is not pertinent to the Plaintiff's Motion to Dismiss and Strike.